Filed 7/14/26  Intel Corp. v. Freedom Circle Venture CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| INTEL CORPORATION, | H053201 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 24CV444337) |
| v. | |
| FREEDOM CIRCLE VENTURE, LLC, et al., | |
| Defendants and Respondents. | |

This appeal arises from an agreement between Intel Corporation (Intel) and Freedom Circle Venture, LLC (Freedom Circle Venture), an entity owned and managed by Greystar Real Estate Partners, LLC and related entities (together, Greystar[1]), for the sale of real property.  After Freedom Circle Venture refused to make a "post-closing payment" of $20 million, Intel sued Freedom Circle Venture and Greystar for breach of contract and other claims.

Freedom Circle Venture and Greystar separately demurred to the complaint.  The trial court sustained both demurrers after concluding that

---

[1] This opinion uses "Greystar" to refer to defendants Greystar Real Estate Partners, LLC (Greystar Real Estate), GS Freedom Circle Holdings, LLC (GS Freedom Circle), and Greystar Investment Group, LLC (Greystar Investment Group).

the agreement was not reasonably susceptible to Intel's interpretation. Intel declined to amend the complaint, and the court entered judgment against it.

On appeal from the judgment, Intel contends it adequately stated a cause of action for breach of contract, which to survive demurrer requires only that the plaintiff show the agreement is reasonably susceptible to the meaning alleged in the complaint. Intel further maintains the trial court erred in construing the agreement with respect to the other asserted causes of action and allegations of agency and alter ego liability as to Greystar.

We agree and conclude that Intel has stated cognizable claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Freedom Circle Venture. We further decide Intel has adequately alleged theories of agency and alter ego liability against Greystar. We therefore reverse the judgment and direct the trial court to vacate the order sustaining defendants' demurrers and enter a new order overruling the demurrers as to all causes of action in the complaint.

## I. FACTS AND PROCEDURAL BACKGROUND

On appeal from the sustaining of a demurrer, we accept as true the following, well-pleaded facts alleged in the complaint. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1189, fn. 1; *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 (*Yvanova*).)

*A. Facts*

Intel is the former owner of 13.34 acres of undeveloped property located on Freedom Circle in Santa Clara (the property). At the time of the events at issue, the property was zoned for office development.

Greystar is a global real estate company engaged in real estate development and rental housing management. Greystar, as relevant to this dispute, operates through its subsidiary entities, including Greystar

2

Investment Group, which is the manager or member of GS Freedom Circle, which in turn is the manager or member of Freedom Circle Venture. Greystar Real Estate is thus the "ultimate parent" of Freedom Circle Venture (the entity that purchased the property in 2017).

1. The Agreement

In 2015, Intel solicited and received multiple purchase offers for the property. Intel received an offer from Greystar GP, LLC, an affiliate of Greystar. In June 2015, Intel entered into an agreement with Greystar GP II, LLC (Greystar GP II), another Greystar affiliate, to purchase the property for $55 million. Ali Warner, a senior managing director and representative of Greystar, served as its lead negotiator for the transaction.

The agreement, signed by Warner and titled "Purchase Agreement and Escrow Instructions" (some capitalization & boldface omitted) (agreement), described Greystar GP II's intent to rezone the property. Because the property was zoned only for office use, Greystar would need city approval for the desired development.

The agreement set a closing date of November 17, 2015, defined Intel as the " 'seller' " and Greystar GP II as the " 'buyer,' " and further specifically defined the terms " 'project' " and " 'project approvals.' "[2] (Boldface omitted.) The agreement stated, " 'Project' means a mixed use office and market rate apartment community, together with related amenities, to be developed on the property. 'Project approvals' shall mean all applications, improvement plans, drawings and specifications, site plans, permits, license, maps, zoning

---

[2] The relevant documents capitalize the defined terms "seller," "buyer," "project," "project approvals," "agreement" "existing restrictions," "project approval date," and "post-closing payment." For readability, we omit the initial capital when quoting from the contract documents and when referencing these defined terms.

changes, specific plan amendments, general plan amendments, entitlements approvals, agreements, documents and other instruments necessary or appropriate to obtain from the City of Santa Clara . . . for the design, subdivision, development, construction, use and operation of the project on the [property]."  (Boldface omitted.)

The agreement further addressed the process for Greystar GP II to obtain approval for the project in several provisions.

Section 3.3(a) on "pursuit of project approvals" (capitalization & underlining omitted) stated:  "Seller hereby authorizes buyer to pursue and acquire the project approvals for the project . . ..  Seller hereby agrees to execute those consents and/or applications which may be required by the [c]ity or other [g]overnmental [a]gency for buyer to process and obtain the project approvals prior to buyer's purchase of same."

Section 3.7 on "removal of existing restrictions" (capitalization & underlining omitted) described Intel's disclosure of the existing development restrictions on the property and stated:  "Seller acknowledges that buyer has disclosed to seller that the project that buyer intends to construct on the property requires both office and residential use of the property . . ..  Buyer intends to cause the existing restrictions to either be terminated so they no longer affect the property and are not shown on buyer's [t]itle [p]olicy or modified in a manner acceptable to buyer in buyer's sole discretion.  Seller agrees to reasonably cooperate with buyer, at no cost or liability to seller, in connection with buyer's efforts to either terminate the existing restrictions or modify such existing restrictions in a manner acceptable to buyer."

The parties also included, in section 7.5, an integration clause stating that the agreement "constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may not be modified,

4

amended or otherwise changed in any manner except by a writing executed by the party against whom enforcement is sought."

After Intel and Greystar GP II executed the agreement, Greystar pursued rezoning for the proposed development. Representatives of Greystar presented a development plan to the City of Santa Clara (City) that included a proposal to build three, high-density housing units on the property. Some City council members opposed the scale of the proposed residential development. Uncertain whether the City would approve rezoning the property to permit the development that Greystar sought, in September 2015 Greystar GP II terminated the agreement with Intel.

## 2. The First Amendment

The following month, Warner contacted Intel about assigning Greystar GP II's interest in the agreement to Freedom Circle Venture. Intel understood that Freedom Circle Venture was a newly formed entity managed by GS Freedom Circle. In October 2015, Intel entered into a "Reinstatement and First Amendment to Purchase Agreement and Escrow Instructions" with Freedom Circle Venture (first amendment). Warner again led the negotiations and signed the first amendment on behalf of Freedom Circle Venture.

The first amendment reinstated the terms of the prior agreement, stated that Greystar GP II had assigned its interest in that agreement to Freedom Circle Venture, and rescinded Greystar GP II's termination notice. It stated that the parties "agree that, except as modified by this [a]mendment, the terms and provisions of the [o]riginal agreement shall be in full force and effect."

As for the terms of the original agreement, the parties agreed that "[i]nitially capitalized terms not defined herein shall have the same meaning

5

as set forth in the [o]riginal agreement." The first amendment modified certain dates in the agreement, including the closing date, which it redefined as May 17, 2017. It also redefined the purchase price for the property as $60 million. The first amendment did not redefine the terms for " 'project' " or " 'project approval.' " It stated that the "agreement, as modified by this [first amendment], shall constitute the entire agreement of the parties with respect to the subject matter of this agreement. The [o]riginal agreement, as amended by this [first amendment], shall remain unchanged and continue in full force and effect."

Greystar continued its efforts to obtain City approval for rezoning the property. Intel supported the efforts by providing written consent for the application prior to the closing of the sale of the property. As the May 2017 closing date approached, the City's approval of the rezoning application remained uncertain. Intel entered another round of negotiations with Warner and Greystar representatives. Warner sought to extend the closing date to allow additional time for the City to approve the proposed rezoning; however, Intel wanted to close the sale which had been pending since 2015.

### 3. The Second Amendment

Intel and Greystar negotiated a second amendment to the agreement that addressed both sides' concerns. Intel agreed to sell the property for the reduced price of $35 million, and Freedom Circle Venture agreed to complete the purchase regardless of the status of the zoning (i.e., subject to the existing zoning restrictions) and to pay Intel an additional $20 million if Freedom Circle Venture obtained the zoning approvals it sought for the property within a stated period. This "essentially reallocated the risk that the property would not be rezoned for residential development to Intel. Intel received a reduced payment of $35 million at closing, but by way of the $20

6

million post[-]closing payment, would share in the increased value of the property if it was rezoned to allow residential development in the future."

In May 2017, Intel and Freedom Circle Venture executed the "Second Amendment to Purchase Agreement and Escrow Instructions" (some capitalization omitted) (second amendment). Warner again signed on behalf of Freedom Circle Venture. The second amendment set the closing date to June 30, 2017, redefined the purchase price set forth in section 1.1 of the agreement to $35 million, and established a "[p]ost[-c]losing payment" provision.

That provision acknowledged Freedom Circle Venture's "intent[] to process the project approvals following the [c]losing [d]ate" and stated that when requested by Intel, Freedom Circle Venture "shall provide to seller an update concerning such buyer's progress in the project approvals." It further established the timeline for the post-closing payment, providing that "[i]f the project approval date (as defined below) occurs on or before June 30, 2025, then, not later than thirty (30) days following the project approval date, buyer shall pay to seller, in immediately available funds, . . . $20[ million]." Section 3(c) of the second amendment defined "project approval date" (boldface omitted) as "the date that the buyer receives the project approvals requested by buyer from the City and other applicable [g]overnmental [a]gencies for the project."

As with the first amendment, the second amendment expressly stated that any "[i]nitially capitalized terms" not defined in the second amendment "shall have the same meaning as set forth in the [o]riginal agreement." It provided that the original agreement, as modified by the second amendment, "shall constitute the entire agreement of the parties with respect to the subject matter of this agreement. The [o]riginal agreement, as amended by

7

this [a]mendment, shall remain unchanged and continue in full force and effect."

The parties closed the sale of the property in late June 2017, and Freedom Circle Venture paid Intel the $35 million purchase price. Warner wrote to Intel, " 'on behalf of the Greystar team' " to " 'thank [Intel] for working with us to close on the Freedom Circle land parcel.' "

4. Intel's Request for Post-closing Payment

During the next five years, Intel requested, and Greystar employees provided, periodic updates pursuant to section 3(a) of the second amendment. Intel requested and received updates from a Greystar representative in August 2018, December 2021, and March 2022. In August 2018, Greystar's senior director of development Jonathan Fearn informed Intel of the expected approval timeline and stated " 'we feel good about our position at this time.' " Jimmy Ly, another Greystar employee, informed Intel in March 2022 that " 'we remain optimistic that we'll be fully entitled by the end of May.' "

After repeated requests by Intel in September and October 2022 for an update, Fearn reported that in July 2022, the City had approved a project for over 1,000 residential units on the property (comprising three residential apartment buildings on the property with ground floor retail space). Pursuant to section 3(b) of the second amendment Intel requested the post-closing payment of $20 million. Fearn replied that the payment was due "only 'upon the entitlement of a mixed-use office and apartment project, not a rezoning of the property to high density residential.' " Greystar asserted that no post-closing payment was owed because the project had not been rezoned as defined in the agreement.

Intel disagreed, but representatives for Greystar and Freedom Circle Venture declined to engage with Intel to resolve the dispute.

8

*B. Procedural History*

In July 2024, Intel filed this action against Freedom Circle Venture and Greystar (together, defendants), seeking to enforce the second amendment and receive the $20 million post-closing payment.

Intel alleged that because Freedom Circle Venture obtained approval within the contractual timeframe of the second amendment to rezone the property to "allow[] the more valuable residential development," Freedom Circle Venture had "receive[d] the project approvals requested by [it]," triggering the requirement that it make the post-closing payment to Intel. It also alleged that although Freedom Circle Venture nominally was the buyer of the property, it operated as an agent and alter ego of Greystar, which controlled all aspects of the negotiation and execution of the agreement and amendments. Intel alleged that, while it performed fully under the agreement, defendants breached the second amendment by refusing to pay the $20 million.

Intel alternatively alleged that if, as claimed by Greystar in its communications with Intel, the project approvals required to trigger the post-closing payment "do not include the approvals actually obtained by Freedom Circle Venture, then [d]efendants have breached their duty of good faith and fair dealing owed to Intel under the agreement, wrongfully depriving, impairing, and injuring Intel's enjoyment of its rights, benefits, and full value of the agreement by, among other things, failing to pursue the project approvals that would have triggered Freedom Circle Venture's obligation to pay Intel the $20 million post[-]closing payment provided for in [s]ection 3(b) of the [s]econd [a]mendment."

Intel further alleged that if the project approvals obtained by Freedom Circle Venture do not trigger the post-closing payment, it is due to actions by

9

Greystar, whose conduct caused Freedom Circle Venture to stop pursuing the project approvals that would have triggered the payment obligation. Intel alleged that Greystar thus disrupted and interfered with Freedom Circle Venture's performance under the agreement.

Based on the above facts, Intel asserted against all defendants causes of action for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) declaratory relief. As to Greystar (specifically, GS Freedom Circle, Greystar Investment Group, and Greystar Real Estate Partners), Intel asserted an additional cause of action for intentional interference with contractual relations.

Greystar and Freedom Circle Venture separately demurred to the complaint. Freedom Circle Venture asserted that, assuming the allegations to be true, the complaint failed to state a cause of action for breach of contract under the plain and unambiguous terms of the agreement. It argued that Intel "cannot pursue a breach of contract cause of action against Freedom Circle that is unsupported by—and in fact is directly contradicted by—the clear and express terms of the" agreement and second amendment. Freedom Circle Venture also maintained the first cause of action was vague and uncertain to the extent it alleged breach of contract in relation to a project that is not described or defined by any term of the agreement or second amendment. As to the second cause of action, Freedom Circle Venture argued it was superfluous (based on the same allegations forming the breach of contract cause of action) and failed as a matter of law because it sought to impose duties beyond those incorporated in the terms of the agreement. Freedom Circle Venture asserted the third cause of action for declaratory relief was redundant of Intel's breach of contract cause of action.

Greystar challenged the complaint on separate grounds. It asserted that the first three causes of action could not be maintained against GS Freedom Circle, Greystar Investment Group, and Greystar Real Estate Partners because they were not parties to the agreement or second amendment. Greystar contended that Intel's alter ego and agency theories of liability for the noncontracting entities could not be applied to bind a parent entity to its subsidiary's contract and, in any event, the complaint failed to contain allegations that would support such an application of vicarious liability. Greystar further argued Intel's intentional interference cause of action failed as matter of law, including because Greystar was not a stranger to the agreement (as required for an intentional interference claim) and because there was no allegation that the noncontracting entities interfered with any benefit to which Intel was entitled under the contract (since the agreement did not *require* Freedom Circle Venture to pursue approval for the defined mixed-use project). Greystar reiterated Freedom Circle Venture's arguments as to the alternatively pleaded second cause of action for breach of the covenant of good faith and fair dealing.

Intel opposed both demurrers, and defendants filed separate replies.

The trial court issued a written order after hearing (order). It sustained both demurrers as to all four causes of action and granted Intel leave to amend.

In its order, the trial court concluded that the language of the agreement and second amendment was not "reasonably susceptible" to the meaning ascribed in the complaint. The court found that "project" is defined in the agreement as mixed-use office and residential development, and while the second amendment altered and redefined parts of the agreement (extending the "project approval date" and adding the "post[-]closing

11

payment"), it did not change or alter the definitions of "project" or "project approvals." The court held that the agreement and second amendment were not reasonably susceptible to Intel's interpretation "[b]ased on what is currently before the [c]ourt."

As to the second cause of action for breach of the implied covenant of good faith and fair dealing, the trial court rejected Intel's argument that a fundamental aspect of the parties' agreement was their intent that the discounted price and post-closing payment be tied to Freedom Circle Venture's continued pursuit of the project approvals. The court reasoned that the language of the agreement cannot be so construed, because the second amendment stated only that the post-closing payment would be due "*[i]f* the project approval date (as defined below) occurs" (boldface omitted), not that Freedom Circle Venture was *required* to pursue those project approvals. The court concluded that Intel's claim for breach of the implied covenant of good faith and fair dealing depended on obligations not stated and/or imposed in the agreement and amendments.

Citing its decisions on the first and second causes of action, the trial court sustained the demurrer as to the declaratory relief cause of action due to the lack of any present controversy.

The trial court also sustained Greystar's demurrer as to the fourth cause of action for intentional interference with contractual relations. Based on its prior conclusion that the language of the agreement and second amendment did not require Freedom Circle Venture to pursue the project approvals defined in the agreement, the court reasoned that Greystar could not have caused a breach or disruption of the contractual relationship by causing Freedom Circle Venture to pursue an alternative project that did not trigger the post-closing payment.

12

Intel elected not to amend the complaint. The trial court entered judgment in favor of defendants, from which Intel now appeals.

## II. DISCUSSION

Intel contends its complaint alleges a reasonable construction of the post-closing provision based on the text, purpose, and circumstances of the agreement and second amendment. It maintains the trial court erred in construing the agreement narrowly based on the defined terms " 'project' " and " 'project approvals' " and without fairly considering the second amendment's provision establishing a " 'project approval date.' " Intel argues that in so doing, the court misapplied the pleading standard on demurrer for a breach of contract claim, misinterpreted Intel's alternative claim for breach of the implied covenant of good faith and fair dealing as imposing obligations beyond those contracted for in the agreement and second amendment, and dismissed the claims against Greystar on the same erroneous grounds.

Defendants counter that the trial court correctly construed the agreement in sustaining the demurrers. Both Greystar and Freedom Circle Venture assert that the agreement required Freedom Circle Venture to pay Intel the $20 million post-closing payment if the "project approval date" as defined in the second amendment occurred before June 30, 2025, where "project approval date" is the date by which Freedom Circle Venture "receives the project approvals requested by [it] . . . for the project," and "project approvals" and "project" are specifically defined in the agreement.

Freedom Circle Venture argues that the terms of the agreement and second amendment are unambiguous and not reasonably susceptible to Intel's proposed interpretation, which would rewrite several defined terms and impose additional obligations on Freedom Circle Venture. Greystar further maintains that nothing in the agreement or amendments required

13

Freedom Circle Venture to pursue a specific development project but rather reserved to it "sole discretion" over what development approvals it would seek. Greystar also argues that its entities are not parties to the agreement, and Intel has failed to establish a cognizable claim for liability based upon the theory that Freedom Circle Venture was either its alter ego or agent.

### A. Standard of Review

Where, as here, a complaint is sustained with leave to amend and the plaintiff elects not to avail itself of that opportunity but to stand on its pleading, the plaintiff may challenge the order sustaining the demurrer by appealing from the ensuing judgment of dismissal. (*Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 753 (*Shaw*).) On appeal from the judgment of dismissal, we review de novo the trial court's order sustaining the demurrer. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.) A demurrer tests whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

In reviewing a demurrer order, "we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law." (*Yvanova, supra*, 62 Cal.4th at p. 924.) "We independently evaluate the challenged pleading, construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context." (*Shaw, supra*, 95 Cal.App.5th at p. 753; accord, *Blank, supra*, 39 Cal.3d at p. 318; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 (*Quelimane*).) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane*, at p. 38; *Shaw*, at p. 754.)

14

The plaintiff's election not to amend the complaint is treated on appeal as an admission that "the complaint contained the strongest statement of the plaintiff's cause or causes of action." (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 764; accord, *Shaw, supra,* 95 Cal.App.5th at p. 753.) "We must presume the [complaint] as pled is the strongest case appellant can make." (*Le Mere v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 237, 244.) "Thus, unlike when a demurrer is sustained without leave to amend, we determine only whether the plaintiff stated a cause of action, and not whether the plaintiff might be able to do so." (*Lyles*, at p. 764.)

*B. Breach of Contract (First Cause of Action)*

Greystar and Freedom Circle Venture each demurred to Intel's first cause of action for breach of contract. We address together the arguments pertaining to the sufficiency of the pleading to state a breach of contract claim. We separately address Greystar's contention that Intel has failed to plead liability as to the noncontracting entities for the alleged breach of Freedom Circle Venture.

1. Additional Background

Intel alleged that when it entered into the second amendment with Freedom Circle Venture in May 2017, the property remained zoned for office use only. Greystar, the parent company of Freedom Circle Venture, had been unsuccessful in its efforts to obtain approval from the City to obtain rezoning that would allow for its more valuable use as a residential development. Freedom Circle Venture and Intel thus "agreed to shift some of the financial risk of Freedom Circle Venture not obtaining" the rezoning approval by agreeing to a reduced sale price of $35 million by the June 30, 2017 closing date regardless of zoning approvals, and a $20 million post-closing payment

15

to Intel if the City approved "at least some residential development on the [p]roperty by June 30, 2025."

Intel alleged that Freedom Circle Venture also agreed, as part of the second amendment, to provide Intel with "updates on its progress in obtaining the project approvals upon which the $20 million post[-]closing payment depended." Pursuant to that provision of the second amendment, for approximately five years after closing the sale of the property, Intel requested and received periodic updates from Greystar employees concerning Freedom Circle Venture's progress in the " 'project approvals.' "

According to Intel, Freedom Circle Venture and Greystar "got everything they bargained for," triggering the post-closing payment obligation, when they obtained approval for the development of three residential apartment buildings on the property with ground-floor retail space. Intel alleged that because Freedom Circle Venture "obtained the project approvals for its project on or before October 4, 2022, and was permitted to proceed with its desired residential development" but "has refused to pay Intel the $20 million post[-]closing payment," it breached its obligation under sections 3(b) and (c) of the second amendment.

The post-closing payment provisions set forth in section 3 of the second amendment state:

"(a) Seller acknowledges that buyer intends to process the project approvals following the [c]losing [d]ate. When requested by seller, buyer shall provide to seller an update concerning such buyer's progress in the project approvals."

"(b) If the project approval date (as defined below) occurs on or before June 30, 2025, then, not later than thirty (30) days following the project approval date, buyer shall pay to seller, in immediately available funds, [$20

16

million] ('post[-]closing payment').  Buyer shall promptly notify seller in writing if and when the project approval date occurs. . . ."  (Boldface omitted.)

"(c) For purposes of this [a]mendment, 'project approval date' shall mean the date that the buyer receives the project approvals requested by buyer from the City and other applicable [g]overnmental [a]gencies for the project."  (Boldface omitted.)

### 2. Principles of Contract Interpretation on Demurrer Review

In matters of contract interpretation, our fundamental goal "is 'to give effect to the mutual intention of the parties as it existed at the time of contracting.' "  (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 530 (*Hewlett-Packard*); see Civ. Code, § 1636; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).)  We look to the language of the contract and ascertain the parties' intent, if possible, based solely on the contract's written provisions.  (*Hewlett-Packard*, at p. 531, citing Civ. Code, §§ 1638, 1639.)  We interpret the written provisions according to their " ' "clear and explicit" meaning . . ., interpreted in their "ordinary and popular sense," . . . .. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' "  (*Hewlett-Packard*, at p. 531, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)

"At the same time, we also recognize the 'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.  (Civ. Code, § 1647).' "  (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752.)  A contract provision "will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable."  (*Waller*, *supra*, 11 Cal.4th at p. 18.)  "But language in a contract must be interpreted

17

as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Id*. at pp. 18–19.)

On review from the sustaining of a demurrer, to decide whether a plaintiff has stated a cause of action for breach of contract, "we must determine whether the alleged agreement is 'reasonably susceptible' to the meaning ascribed to it in the complaint." (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1384 (*Klein*).) "Where written instruments are the foundation of a claim . . . and are incorporated in a pleading, the recitals of the instruments take precedence over allegations in the pleading itself unless the incorporated instruments are susceptible to more than one interpretation." (*Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 468; accord, *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 (*Aragon-Haas*) ["[A] general demurrer . . . admits not only the contents of the instrument but also any pleaded meaning to which the instrument is reasonably susceptible."].)

Thus, "[i]f the allegations in the complaint conflict with attached exhibits, we rely on and accept as true the contents and legal effect of the exhibits. [Citations.] However, 'if the exhibits are ambiguous and can be construed in the manner suggested by plaintiff, then we must accept the construction offered by plaintiff.' " (*Chisom v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 218 Cal.App.4th 400, 410–411 (*Chisom*).) " 'So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' " (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 239.) On the other hand, "for purposes of a demurrer, a court is not

18

required to accept as true a plaintiff's allegations of contractual terms where, in light of the written agreement attached to the pleading, such allegations would place a 'clearly erroneous construction upon the provisions' of the attached agreement." (*Chisom*, at pp. 415–416.)

So, too, although extrinsic evidence (or parol evidence) cannot be used to add to or vary the terms of an integrated agreement, it may be admitted "to explain what the parties meant by the language they used." (*Aragon-Haas, supra*, 231 Cal.App.3d at p. 240; *Hewlett-Packard, supra*, 65 Cal.App.5th at p. 531.) California courts have adapted the parol evidence rule[3] for demurrer review, where the admissibility of evidence is not at issue but parol evidence alleged in the complaint may need to be addressed.

As explained by one appellate court: "In the context of a demurrer, the court must conditionally consider the parol evidence alleged in the complaint, to determine if it would be relevant to prove a meaning to which the language of the instrument is reasonably susceptible. Thus, trial courts err if they

---

[3] The California Supreme Court, in a non-demurrer case, explained the appropriate test for the admissibility of extrinsic evidence: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37.) Thus, "a court may preliminarily consider all credible evidence offered to prove the intention of the parties to a contract, even if a disputed term appears to the court to be unambiguous on the face of the instrument." (*Montrose Chemical Corp. of California v. Superior Court* (2025) 114 Cal.App.5th 889, 897, review granted Dec. 30, 2025, S293914.) In *Montrose*, the appellate court denied a petition for writ of mandate challenging the trial court's exclusion of extrinsic evidence offered to interpret disputed language in an insurance contract where the language was the subject of prior judicial opinions construing the same policy language. (*Id*. at pp. 898–899.)

refuse to consider the alleged parol evidence on the ground that no parol evidence of any sort is pertinent because the particular contract in dispute is unambiguous. But there may be no error if the trial court conditionally accepts as true that the plaintiff can proffer specified parol evidence and, having considered the parol evidence allegations, then determines as a matter of law that the parol evidence alleged must be disregarded because, for whatever reason, the contract is not reasonably susceptible of the interpretation plaintiff alleged." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1122 (*George*).)

Whether the contract is ambiguous is a question of law. (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 239.) On appeal, we apply de novo review in construing the contract. (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531.)

  3. Analysis

Intel contends that the trial court's interpretation of the agreement and second amendment misapplied the pleading standard for demurrer review of a breach of contract claim. It argues that the court dismissed Intel's claims based on a limited textual analysis that failed to analyze the agreement's terms in light of the complaint's allegations concerning its circumstances and purpose. Intel maintains that it alleged a reasonable construction of the second amendment that gives effect to its text, fulfills its purpose, and is consistent with Intel's alleged extrinsic evidence concerning the parties' course of conduct. Intel asserts that because its alleged interpretation is not " 'clearly erroneous' " under the instrument, it must be accepted as true on demurrer review. (See *Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 239.)

Freedom Circle Venture counters that when the contract language is unambiguous and the plaintiff's alleged interpretation " 'clearly erroneous,' " the trial court may construe the contract as a matter of law and need not

20

treat the allegation as true. (See *Chisom*, *supra*, 218 Cal.App.4th at pp. 410–411.) Greystar similarly argues that the agreement and second amendment unambiguously provided that the post-closing payment would occur only if Freedom Circle Venture received the " 'project approvals' . . . for the 'project,' " defined as a " 'a mixed use office and market rate apartment community.' " As it is undisputed that Freedom Circle Venture did not receive approval for a mixed-use project, Greystar asserts that Intel cannot state a cause of action for breach of contract. Therefore, the noncontracting Greystar entities cannot be liable, even if Intel successfully alleged alter ego or agency liability.

To assess Intel's and defendants' arguments, we consider the text and language of the agreement and second amendment, the agreement's alleged context, purpose, and circumstances, and any extrinsic evidence Intel has alleged may be relevant.

Starting with the written provisions of the agreement and second amendment, several features are apparent. First, the terms " 'project' " and " 'project approvals,' " defined in section 1.1 of the agreement and referenced without alteration in the second amendment, are unambiguous. The " 'project,' " defined as a "mixed use office and market rate apartment community, together with related amenities, to be developed on the property" plainly refers to the development of a "mixed" office and residential apartment community. Intel does not seriously contend otherwise, and, moreover, the agreement in section 3.7 expressly confirmed that to be the parties' understanding, stating that the seller (Intel) "acknowledges that . . . the project that buyer intends to construct on the property *requires both office and residential use of the property*." (Italics added.)

21

" 'Project approvals' " refers to all applications and approvals required by the City and government agencies to carry out development, construction, and operation of "the project on the real property" (using the capitalized, defined term for " 'project' "). Thus, the defined term " 'project approvals' " refers unambiguously to the proposed mixed-use office and residential development " 'project.' "

Nevertheless, a contract and all its parts must be read together, giving effect—where possible—to each part, and treating individual clauses as subordinate to the overall general intent. (Civ. Code, §§ 1641, 1650.) In ascertaining general intent, we refer not only to the language of the agreement but " 'to the circumstances under which it was made and the matter to which it relates. (Civ. Code, § 1647.)' " (*Mountain Air*, *supra*, 3 Cal.5th at p. 752; *Waller*, *supra*, 11 Cal.4th at p. 18.)

Intel contends the controlling provisions for purposes of its breach of contract claim are set forth in section 3.3 of the second amendment governing "post[-]closing payment." Intel argues that the amendment conditioned the post-closing payment on the newly introduced " 'project approval date' " provision, which tied the payment obligation to the approvals " 'requested by buyer,' " i.e., by Freedom Circle Venture.

Intel emphasizes that the parties did not merely condition the post-closing payment on Freedom Circle Venture's receipt of the predefined " 'project approvals' " for the " 'project,' " but instead added a new provision "for purposes of the [second] amendment" that tethered the payment obligation to when Freedom Circle Venture " 'receives the project approvals *requested by buyer* from the City.' " (Italics added.) Intel argues that the phrase " 'requested by buyer' " modified the previously defined " 'project approvals' " to create a new obligation tied to the " 'project approval date.' "

22

Intel maintains that the newly added " 'project approval date' " reflected an intentional choice by the parties in negotiating the second amendment to incentivize closing the sale of the property by enabling Intel and Freedom Circle Venture to share in the risk and upside of Greystar's goal of rezoning the property to enable residential development. Intel argues that defendants' interpretation of the second amendment limiting Freedom Circle Venture's obligation to make a post-closing payment to its receipt of the predefined "project approvals" for the "project" is unreasonable because it would mean the parties intended Intel to share in the upside benefit of Freedom Circle Venture receiving rezoning approvals *only* if those approvals retained some amount of the property's less valuable office zoning and not if Freedom Circle Venture modified or changed the approvals to a higher value residential development without office use.[4]

Intel further contends that such an inflexible interpretation is inconsistent with section 3.7 of the original agreement, which granted the "buyer" (then Greystar GP II, later replaced by Freedom Circle Venture) discretion and authority to " 'terminate' " or " 'modify' " the existing restrictions on the property " 'in a manner acceptable' " to buyer while requiring Intel, as the seller, " 'to reasonably cooperate' " with the buyer in connection with those efforts. Intel argues that the second amendment maintained and carried forward this deliberate provision authorizing

---

[4] Intel does not address the relevance to the demurrer analysis of the ground-floor retail component of the approved project. Freedom Circle Venture references the retail component only to emphasize that the City's approval of three residential apartment buildings with ground floor retail space does not meet the "unambiguous definition of the '[p]roject' as a 'mixed use office and market rate apartment' development."

23

Freedom Circle Venture, as the buyer of the property, to adjust the approvals to remove existing restrictions " 'in a manner acceptable to' " it.

Intel also asserts that the parties' course of conduct in relation to the second amendment confirms its interpretation of the agreement. Intel alleged that between 2017 and 2022, it sought and received updates from Greystar employees about Freedom Circle Venture's progress in securing the requested approvals. Yet, at no point (until Intel requested the post-closing payment) did any Greystar or Freedom Circle Venture representative suggest that the approvals they were pursuing (and about which Intel was inquiring) were not the "project approvals" subject to the agreement, nor that the residential development ultimately approved was not a "project" for purposes of the post-closing payment.

Intel argues that defendants took the position that approval of a residential development would fall outside the scope of the second amendment only *after* the dispute arose over the $20 million post-closing payment, such that the pre-dispute course of performance evidence is the best evidence of the parties' understanding of the agreement. (See *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 920 ["[T]he terms set forth in an integrated writing 'may be explained or supplemented by course of dealing . . . or by course of performance.' (Code Civ. Proc., § 1856, subd. (c).)"].)

We agree with Intel. Considering the language of the agreement and second amendment as a whole and the context and purpose of the agreement and amendments, including the alleged extrinsic evidence on course of conduct, Intel's proposed construction is at least " 'reasonably susceptible' to the meaning ascribed to it in the complaint" (*Klein, supra*, 202 Cal.App.4th at p. 1384). Moreover, Intel's construction does not "place a 'clearly erroneous

24

construction upon the provisions' of the attached agreement." (*Chisom*, *supra*, 218 Cal.App.4th at pp. 415–416.)

To begin, the definitions of "project" and "project approvals"—though themselves narrowly drawn and unambiguous—cannot be read to contravene the purpose of the agreement as a whole. (Civ. Code, §§ 1641, 1650.) The agreement in section 3.3(a) set forth the parties' intent to authorize the buyer (then Greystar GP II) to "pursue and acquire" the defined "project approvals for the project." The agreement broadly defined " 'project approvals' " (boldface omitted) to include all zoning changes, entitlements approvals, agreements, and instruments "necessary or appropriate to obtain" from the City and other governmental entities for the project. In section 3.7, the agreement acknowledged that the buyer's intent for the property "require[d] both office and residential use" and conferred discretion on the buyer to pursue removing or modifying the "existing restrictions" on the property in a manner acceptable to it.[5]

By adding the " 'project approval date' " (boldface omitted) provision as the agreed-upon event that would require Freedom Circle Venture to pay Intel the post-closing payment, the second amendment supports a determination that the contract may be reasonably susceptible to more than one interpretation. That provision (referring to the "date that the buyer receives the project approvals requested by buyer from the City and other applicable [g]overnmental [a]gencies for the project") must be construed, if

[5] Section 3.7 specifically defines "existing restrictions" in terms of certain restrictive covenants. Given that limitation, we have doubts about the parties' characterization of section 3.7 as conferring discretion and flexibility upon the buyer with respect to zoning changes. We need not (and do not) definitively construe section 3.7 because our conclusion that the trial court erred in sustaining respondents' demurrers does not depend on the scope of the discretion that the provision affords to buyer.

possible, according to its " ' "clear and explicit" meaning . . ., interpreted in [its] "ordinary and popular sense." ' " (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531; see Civ. Code, §§ 1638, 1639.)

Applying this standard, we decide the post-closing payment's "project approval date" provision is susceptible to more than one meaning. (See *Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531.) The ordinary meaning of " 'project approval date' " (boldface omitted) would be reasonably understood by a layperson to refer, as Intel maintains, to the "project approvals requested by [the] buyer . . . for the project," meaning those approvals that were in fact requested by Freedom Circle Venture. However, applying the agreement's defined terms "project" and "project approvals" narrows that understanding, rendering the meaning of the provision unclear.

On one hand, the strict definitions set forth in section 1.1 of the agreement appear to restrict the second amendment's post-closing payment provision only to the previously defined *project approvals* requested by the buyer for the defined *project*. Freedom Circle Venture asserts this interpretation is the only reasonable one, where the parties had two opportunities negotiating the first and second amendments to redefine "project approvals" and "project" but did not do so. To the contrary, the first and second amendments provided that initially capitalized terms not defined in the second amendment (including "project approvals" and "project") retained " 'the same meaning as set forth in the' " agreement.

Freedom Circle Venture further asserts that use of the definite article "the" immediately preceding " 'project approvals requested by buyer . . . for the project' " precludes reading the provision as if it applied to "any" project approvals being sought. It maintains that the phrasing " *'the* project approvals *requested by buyer'* " (italics added) specifically tethered the post-

26

closing payment to the original project approvals sought by Greystar, which Intel acknowledged in section 3.7 of the agreement: " 'Seller acknowledges that buyer has disclosed to seller that the project that buyer intends to construct on the property requires both office and residential use.' "

On the other hand, this strict interpretation arguably renders surplusage a key part of the "project approval date" provision that, as set forth in section 3(c) of the second amendment, controlled whether the post-closing payment would be activated. The parties' inclusion of the phrase "requested by buyer" in the new provision, added "[f]or purposes of" the second amendment, could be understood to imply something more than a trigger date for obtaining the predefined "project approvals" "for the project." It specifies with particularity the "project approvals" *requested by buyer* for the "project," lending credible support for Intel's proposed interpretation.

Furthermore, this latter interpretation more closely corresponds to the purpose of the second amendment, given the circumstances in which it was made. (*Mountain Air*, *supra*, 3 Cal.5th at p. 752.) Although the complaint does not allege extrinsic evidence that would alter or clarify the language of the agreement, Intel has alleged the circumstances giving rise to the agreement and second amendment, including the parties' purpose in agreeing to the post-closing payment structure and their post-second amendment course of conduct. Specifically, Intel alleged that after prior failed attempts to close the sale of the property due to ongoing uncertainty over whether the City would approve the residential development Greystar sought for the mixed-use development, Intel and Freedom Circle Venture restructured the deal. The second amendment lowered the sale price for the property under its current zoning restrictions and promised Intel the opportunity to share in

27

the increased value of the property if Freedom Circle Venture succeeded in obtaining the requested rezoning approvals within eight years.

When Intel inquired about the status of the approvals pursuant to section 3.3(a) of the second amendment, representatives of Greystar provided optimistic updates and did not indicate that the agreement was inapplicable to the project for which Greystone was seeking City approval. We accept the truth of these properly pleaded facts (*Yvanova*, *supra*, 62 Cal.4th at p. 924) insofar as they may be admitted "to explain what the parties meant by the language they used." (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 240; *Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531.)

Under these circumstances, the second amendment may be construed in at least two ways. In Freedom Circle Venture's view, the post-closing payment is owed only upon Freedom Circle Venture's receipt of the defined project approvals for the project (comprising mixed-use residential and office). According to Intel, the agreement requires payment upon Freedom Circle Venture's receipt of the project approvals requested by it for the project, including for a 100 percent residential project. Because the contractual language is susceptible to more than one reasonable interpretation, the contractual dispute may not be resolved at the pleading stage.

The cases Freedom Circle Venture rely upon in support of the trial court's order are factually inapposite. Each of those decisions involved contractual terms that were not susceptible to the meaning alleged by the plaintiff and/or conclusively negated the meaning ascribed to them. (See, e.g., *Marzec v. California Public Employees Retirement System* (2015) 236 Cal.App.4th 889, 912 [deciding plaintiffs' claim to increased disability retirement benefits based on added years of " 'service credit' " under public employee benefits agreement conflicted with the express contractual

language, which qualified projected service credit increases as " 'an *estimate*' " (capitalization & boldface omitted) that " 'may not benefit' " employees who take disability retirement]; *George*, *supra*, 201 Cal.App.4th at p. 1128 [rejecting plaintiffs' interpretation and alleged extrinsic evidence concerning "actual cash value" provision of auto insurance policy, where the policy language unambiguously stated it would pay "the actual cash value of the car *up to $25,000*, less the deductible", not a predetermined "actual cash value" of $25,000]; *Klein*, *supra*, 202 Cal.App.4th at p. 1384 [concluding plaintiff's interpretation of Chevron's use of the term "gallon" in advertised fuel prices as units delivered at a specified temperature was inconsistent with ordinary understanding of the term " 'gallon' "].)

 *Aragon-Haas* offers a more useful analogy. There, the plaintiff alleged that her former employer breached their employment contract by terminating her position without cause. (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 236.) The integrated agreement gave the defendant the right to terminate employment during the first year without cause and stated that " '[t]hereafter this Agreement shall be automatically extended' for six consecutive one-year terms." (*Id.* at p. 239, italics omitted.) The appellate court reversed the judgment of dismissal after concluding the provision was reasonably susceptible to the meaning alleged by the plaintiff, since the use of " 'thereafter' ma[de] it unclear whether the right to terminate existed only during the first year of plaintiff's employment or . . . continued throughout the term of employment specified in the contract." (*Ibid*.)

 We recognize, as did the court in *Aragon-Haas*, that Intel's proposed interpretation of the second amendment may ultimately prove invalid. But " '[s]o long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the

complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement.' " (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 239.)

We decide that, given its context and purpose, the second amendment's post-closing payment provision, read together with the terms of the agreement and considering the alleged course of conduct evidence, is at least reasonably susceptible to the meaning alleged in the complaint. (*Aragon-Haas*, *supra*, 231 Cal.App.3d at p. 239.) Accordingly, the trial court erred in sustaining the demurrers to Intel's breach of contract cause of action.

We turn to Greystar's independent arguments as to the liability of the noncontracting entities.

## C. Liability of the Noncontracting Defendants

Intel contends that Greystar is liable for Freedom Circle Venture's breach of contract as the "ultimate parent" of Freedom Circle Venture "and the lead actor in Intel's complaint," as well as for Greystar's own tortious interference with contractual relations. Greystar counters that the noncontracting entities are not liable for Freedom Circle Venture's alleged acts under either an agency or alter ego theory of liability. Greystar relies on the general principles that (1) a contract cannot bind a nonparty, and (2) a parent corporation is not liable for the acts of its subsidiary. It maintains that Intel has not alleged facts sufficient to overcome these baseline principles and state a claim for liability. Greystar also disputes that Intel has adequately stated a cause of action for intentional interference with contractual relations.

### 1. Additional Background

Intel alleged that although Freedom Circle Venture signed the second amendment and purchased the property in June 2017, it did so as an agent or alter ego of Greystar.

30

The complaint alleged specifically that "[t]here [was] a unity of interest and ownership between the different entities," including that the "individuals negotiating the agreement and subsequent amendments . . . failed to observe corporate formalities by interchangeably representing" the four entities (Freedom Circle Venture, GS Freedom Circle, Greystar Investment Group, and Greystar). It alleged that defendants shared employees, maintained the same South Carolina address, and used the same representatives (including Warner and Fearn, whose e-mail signature line referred to "Greystar") to negotiate the agreement and amendments and respond to Intel's inquiries about the project approvals.

The complaint further alleged, on information and belief, that the entities failed to observe corporate formalities in their engagement with the City and submitted requests to the City on behalf of Greystar even though the agreement and amendments identified Greystar GP II and, later, Freedom Circle Venture as the entities responsible for the rezoning applications. It alleged that Freedom Circle Venture was a mere instrumentality for Greystar and its employees who controlled every aspect of the negotiations with Intel, signed the operative agreement and amendments, handled the performance of the obligations under the agreement and amendments, and "caused and effectuated Freedom Circle Venture's breach." It also alleged that if the acts and liabilities of Freedom Circle Venture are treated as those of Freedom Circle Venture alone, there will be an inequitable result because Greystar participated in and benefited from the rezoning and subsequent sale of the property.

In its order sustaining defendants' demurrers, the trial court did not reach the merits of Intel's agency or alter ego theory due to its finding that Intel had failed to state a claim for the substantive breach of contract.

31

2. <u>Analysis</u>

In general, "a parent company is not liable on a contract signed by its subsidiary 'simply because it is a wholly owned subsidiary.' " (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 861 (*Cohen*).)  So, too, a parent corporation is not liable for the acts of its subsidiaries; some other basis of liability must be established.  (*United States v. Bestfoods* (1998) 524 U.S. 51, 61; *Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 991.)

Recognizing that Greystar may not be directly liable for Freedom Circle Venture's alleged breach under the second amendment, Intel advances two theories of indirect liability:  agency and alter ego.

Under agency theory, "[t]he acts of an agent within the scope of his authority bind the principal." (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 705–706.)  Although a parent company is not typically bound by its subsidiary's contracts, "[t]he agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises 'sufficient control over the [subsidiary's] activities' such that the subsidiary becomes a 'mere agen[t] or "instrumentality" of the parent.' " (*Cohen, supra*, 31 Cal.App.5th at p. 862.)

In contrast with agency liability, alter ego allows the trial court to disregard the separate corporate status ("pierce[]" the corporate veil) "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*).)  Whether the doctrine applies is not based on a strict test and "will depend on the circumstances of each particular case." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)

Greystar contends that Intel failed to allege facts sufficient to satisfy either form of liability.

Greystar's arguments misconstrue the pleading standard applicable to Intel's theories of vicarious liability. "Ordinarily, a pleading 'is sufficient if it alleges ultimate rather than evidentiary facts' constituting the cause of action." (*Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1019, quoting *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 550 (*Doe*).) "An allegation of agency is an allegation of ultimate fact that must be accepted as true for purposes of ruling on a demurrer." (*City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212; see *Skopp v. Weaver* (1976) 16 Cal.3d 432, 437.) The same is true for an allegation of alter ego liability. (*Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 236 (*Rutherford*).)

An allegation of ultimate fact requires the plaintiff only to " ' " 'set forth the essential facts . . . with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of his cause of action.' " ' " (*Doe, supra,* 42 Cal.4th 531 at p. 550.) Moreover, trial courts demand less particularity in pleading where the defendant's knowledge of the facts " 'may be assumed to [be] . . . at least equal, if not superior, to that possessed by the plaintiff.' " (*Rutherford, supra,* 223 Cal.App.4th at p. 236.)

In pointing to the complaint's failure to allege certain facts to support the theories of agency and alter ego, Greystar seeks to impose an evidentiary standard of pleading. This is not the applicable standard. (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 886 [In "determining the sufficiency of a *pleading*,. . . the existence of an agency relationship *is* the 'essential fact[],' and where alleged must be accepted as true."]; *Doe, supra,* 42 Cal.4th at p. 550.)

Intel's complaint alleged that Freedom Circle Venture signed the second amendment and purchased the property as "a mere instrumentality of Greystar, which entirely dominated its affairs" in relation to the property transaction. It alleged more specifically that Greystar controlled Freedom Circle Venture's operations in relation to the property purchase, including because Greystar employees negotiated the agreement and amendments, signed the second amendment on behalf of Freedom Circle Venture, responded to Intel's requests for updates about the rezoning approvals, and conducted and effectuated Freedom Circle Venture's alleged breach. These facts are sufficient to support an alleged agency relationship, wherein "the subsidiary can legitimately be described as only a means through which the parent acts." (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 541.)

We similarly conclude that for purposes of review on demurrer, Intel has adequately alleged facts to support its alter ego allegations against Greystar. Intel alleged a "unity of interest and ownership" between Freedom Circle Venture and Greystar based on their common ownership, address, and employees, who "interchangeably" represented Freedom Circle Venture as well as the noncontracting entities and "failed to observe corporate formalities" in negotiating and performing the agreements. Intel also alleged that maintaining corporate separateness and treating Freedom Circle Venture as singularly liable will produce an inequitable result because Greystar equally participated in and benefited from the rezoning and subsequent alleged sale of the property.

Greystar argues that Intel did not allege that Freedom Circle Venture is undercapitalized, or that there is comingling of funds and the noncontracting entities treat Freedom Circle Venture's funds as their own. Those are facts that may reasonably be assumed to be within defendants'

34

possession and obtainable in discovery and therefore need not be alleged in the complaint to state a legally sufficient allegation of vicarious liability. (*Rutherford*, *supra*, 223 Cal.App.4th at p. 236.)

The federal cases Greystar relies on to support its position are inapposite because they were not decided under California's liberal pleading standard on demurrer. (See, e.g., *Wady v. Provident Life and Accident Ins. Co. of America* (C.D. Cal. 2002) 216 F.Supp.2d 1060, 1067 [rejecting plaintiff's reliance on alter ego theory to avoid summary judgment where plaintiff's complaint contained no alter ego allegations]; *Hall-Magner Group v. Firsten* (S.D. Cal. 2011) WL 5036027, at *1, 4 [concluding plaintiff failed to present evidence of alter ego relationship on motion to dismiss for lack of personal jurisdiction]; *Katzir's Floor and Home Design, Inc. v. M-MLS.com* (9th Cir. 2004) 394 F.3d 1143, 1149 [reversing district court's order adding judgment debtors to default judgment on an alter ego theory where evidence did not support alter ego finding]; *Calvert v. Huckins* (E.D. Cal. 1995) 875 F.Supp. 674, 678–680 [granting dismissal for lack of personal jurisdiction where plaintiff failed to produce evidence for a prima facie case that California licensed business was a mere instrumentality of its parent corporations].)

In sum, California law permits a plaintiff asserting agency or alter ego theories to allege in the complaint ultimate rather than evidentiary facts (*Doe*, *supra*, 42 Cal.4th at p. 550) and to pursue, through discovery, those additional facts considered uniquely within the defendants' superior knowledge (*Rutherford*, *supra*, 223 Cal.App.4th at p. 236). Applying these pleading standards to the complaint, we conclude that Intel's alleged theories of agency and alter ego liability against the noncontracting entities are sufficient to survive Greystar's demurrer.

*D. Breach of the Implied Covenant of Good Faith and Fair Dealing*
   *(Second Cause of Action)*

Having determined that Intel adequately pleaded a claim for breach of contract with respect to both Greystar and Freedom Circle Venture, we turn to Intel's alternatively pleaded cause of action for breach of the implied covenant of good faith and fair dealing.[6]

   1. <u>Additional Background</u>

Intel alleged that if the approvals obtained by Freedom Circle Venture fall outside the scope of the post-closing payment provision, then defendants have breached their duty of good faith and fair dealing by failing to pursue the project approvals that would have triggered their obligation to pay Intel the $20 million post-closing payment.

In their demurrers, Freedom Circle Venture and Greystar each contended that the complaint fails to state a breach of the implied covenant cause of action because Intel's claim seeks to impose substantive duties on the defendants that are not found in the agreement and amendments. Freedom Circle Venture also argued that the cause of action merely duplicated the breach of contract cause of action because it is based on the same allegations underlying the alleged breach.

The trial court agreed that the claim for breach of the implied covenant of good faith and fair dealing depended on obligations not stated and/or

---

[6] Intel asserts in its appellate briefing that its claim in the alternative for breach of the implied covenant of good faith and fair dealing "needs to be addressed only if the trier of fact adopts [d]efendants' interpretation of the [s]econd [a]mendment." We understand this statement to be in reference to the factfinding or trial stage of litigation. Because a demurrer tests only the legal sufficiency of factual allegations in a complaint on appeal from the sustaining of a demurrer, we consider whether the allegations concerning the alternatively pleaded second cause of action state a cause of action.

imposed in the agreement and amendments and sustained the demurrers as to the second cause of action.

## 2. Legal Principles

The "modern rules of pleading generally permit plaintiffs to 'set forth alternative theories in varied and inconsistent counts' " (*Klein*, *supra*, 202 Cal.App.4th at p. 1388), including "inconsistent claims predicated on both the existence and absence of" an enforceable agreement (*ibid.*).[7]

" 'The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made.' (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349, italics omitted.) The implied covenant 'finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith.' (*Carma* [*Developers, Inc. v. Marathon Development California, Inc.* (1992)] 2 Cal.4th [342,] 371–372.) The implied covenant cannot, however, 'impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.' (*Guz*, at pp. 349–350.) In other words, 'the scope of conduct prohibited by the covenant of good faith is circumscribed by

---

[7] In this case, the alternative claim is not based on the absence of an enforceable agreement, but on the possibility that the fact finder might construe the second amendment narrowly, concluding that defendants did not breach any obligation under section 3(c) because the approvals ultimately obtained by Freedom Circle Venture were not the predefined " '[p]roject [a]pprovals.' " In that circumstance, Intel would proceed on its alternative claim that defendants frustrated its right to obtain the benefits of the second amendment, as expressed by the post-closing provision stating that Freedom Circle Venture intended to process the agreed-upon "[p]roject approvals" after closing on the sale of the property.

37

the purposes and express terms of the contract.' (*Carma*, at p. 373.)" (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 554.)

3. <u>Analysis</u>

Intel contends that, if it does not prevail in its construction of the agreement on its breach of contract claim, then it is entitled to relief on its alternative claim for breach of the implied covenant of good faith and fair dealing. It argues that its breach of contract claim is based on defendants' refusal to pay the $20 million upon receiving City approval of the " 'project approvals requested by buyer' " under section 3(c) of the second amendment, while its breach of the implied covenant of good faith and fair dealing claim is based on defendants' frustration of the parties' stated expectations under section 3(a) of the second amendment for Freedom Circle Venture to " 'process the project approvals following the [c]losing [d]ate.' "

We agree with Intel that the breach of implied covenant claim is not redundant of Intel's breach of contract claim but instead addresses defendants' implied good faith " 'to do everything that the contract presupposes that [defendants] will do to accomplish its purpose.' " (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093 (*Pasadena Live*).) As detailed *ante*, section 3 of the second amendment added a "post[-]closing payment" provision to the agreement terms. Section 3(a) states, "seller acknowledges that buyer intends to process the project approvals following the closing date. When requested by seller, buyer shall provide to seller an update concerning such buyer's progress in the project approvals."

The parties dispute whether section 3(a) of the second amendment imposed an affirmative duty on Freedom Circle Venture to pursue the specially defined "project approvals." Defendants assert that section 3(a)'s recital of intent, without more, does not create a binding obligation to

perform, particularly given that section 3.7 assigned discretion to the buyer to modify or terminate existing restrictions. Freedom Circle Venture argues, "[t]hat discretion defeats Intel's claim that [Freedom Circle Venture] promised to seek only zoning for the project, which would trigger the post[-]closing payment." Greystar similarly maintains that "Freedom Circle Venture's expressions of 'inten[t]' to obtain the 'project approvals' cannot be read as a promise to obtain those approvals because the agreement expressly provides otherwise" by assigning discretion to the buyer, and that Intel does not identify any terms of the agreement that "actually impose any obligation on Freedom Circle Venture to seek particular approvals."

As with the above-mentioned causes of action, we deem the complaint allegations to be true for the purpose of determining whether Intel has pleaded a breach of the covenant of good faith and fair dealing. (*Pasadena Live*, *supra*, 114 Cal.App.4th at p. 1092.) Considering the language of the agreement and amendments, as well as Intel's factual allegations concerning the circumstances and purpose of the second amendment, we reject defendants' view that Intel seeks to impose on Freedom Circle Venture duties beyond those incorporated in the specific terms of the agreement. (See *Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at pp. 349–350.)

We construe the implied covenant claim as alleging that Intel and Freedom Circle Venture entered into the second amendment with the understanding that Freedom Circle Venture intended to carry forward its efforts to seek the defined project approvals. Section 3(a) of the second amendment manifested that understanding as part of the newly added post-closing payment provision, expressly acknowledging "that buyer intends to process the project approvals following the [c]losing [d]ate." We recognize that the expression of intent set forth in section 3(a) may not, in and of itself,

39

create a binding promise to *obtain* the defined project approvals. But it is undoubtedly sufficient to support Intel's alleged expectation that Freedom Circle Venture would pursue those approvals after the closing date in good faith and not unfairly frustrate Intel's right to receive the benefit of section 3(c) by seeking approval for a project that defendants would later characterize as outside the scope of the parties' agreement.

*Pasadena Live* illustrates this distinction. In that case, Pasadena Live, an event producer, entered a contract with the City of Pasadena (Pasadena) regarding amphitheater renovations and event permitting. (*Pasadena Live, supra,* 114 Cal.App.4th at p. 1091.) Under the agreement, Pasadena Live paid Pasadena $114,550 and agreed to renovate the amphitheater at its expense, and, in exchange, Pasadena agreed to evaluate and process Pasadena Live's application for events on the same basis as applications made by other producers. (*Id.* at p. 1092.) The agreement acknowledged that Pasadena Live had proposed a series of up to 11 events in the amphitheater for the relevant years. (*Ibid.*) However, the complaint alleged that Pasadena had authorized only five events and prevented Pasadena Live from producing the other six events by issuing a letter notifying Pasadena Live that it would not authorize any events produced by it in the next year. (*Ibid.*)

Pasadena Live sued, alleging in a second amended complaint that Pasadena breached the implied covenant of good faith and fair dealing by preventing Pasadena Live from producing the additional events. (*Pasadena Live, supra,* 114 Cal.App.4th at p. 1092.) On appeal, the appellate court reversed the trial court's order sustaining Pasadena's demurrer without leave to amend. The court explained that the agreement "under which Pasadena Live advanced $114,550 for improvements to [Pasadena] property, the amphitheater, envisioned future production by Pasadena Live, albeit there

was no guaranty that any single or specific production proposed by Pasadena Live would be approved by [Pasadena]." (*Id*. at p. 1093.) The court reasoned that under the implied covenant, Pasadena "was required 'to do everything that the contract presuppose[d]' " it would do " 'to accomplish its purpose' " (*ibid*.), meaning it was required at least to consider Pasadena Live's proposals. Hence, Pasadena's alleged conduct refusing any proposals from Pasadena Live for the next year stated a claim for breach of the implied covenant of good faith and fair dealing. (*Ibid*.) On the other hand, the court rejected Pasadena Live's assertion that the agreement gave it a contractual option to produce all 11 events or obligated Pasadena to negotiate and conclude a production contract with Pasadena Live. (*Id*. at p. 1094.)

Similarly here, the second amendment envisioned that Freedom Circle Venture would process the predefined project approvals, though there was no guarantee the City would ultimately approve the rezoning requested. Thus, under the facts alleged, Freedom Circle Venture was required, in good faith, to process the stated approvals and provide updates to Intel regarding their status. Because Intel has alleged that defendants instead "fail[ed] to pursue the project approvals that would have triggered Freedom Circle Venture's obligation to pay Intel the $20 million [p]ost[-][c]losing [p]ayment provided for in Section 3(b) of the [s]econd [a]mendment," Intel has stated a cause of action for breach of the implied covenant of good faith and fair dealing.

Defendants' arguments to the contrary are unpersuasive. Freedom Circle Venture contends the second amendment tied its "contractual obligation to pay a 'post[-]closing payment' solely to the occurrence of a defined 'project approval date.' " Freedom Circle Venture claims that the "operative trigger in [s]ection 3(c) is receipt, not processing, of the project approvals" and argues that its stated "intent to process the project approvals

41

is not a warranty to only pursue those approvals and forego others, nor did it create a condition for the property's sale."

This interpretation of the second amendment may be accurate for purposes of evaluating a breach of contract claim, but it overlooks and fails to assign any significance to the prefatory statement of intent in section 3(a). Because section 3(a) unambiguously expresses the parties' understanding of Freedom Circle Venture's intent to proceed in a manner that would allow fulfillment of the post-closing payment provision, it may serve as the foundation for an implied covenant of good faith and fair dealing claim. (See *Guz, supra*, 24 Cal.4th at p. 349.)

Nor do defendants' arguments based on the buyer's discretion under section 3.7 of the agreement preclude Intel, as a matter of law, from stating a cause of action for breach of the implied covenant of good faith and fair dealing. Freedom Circle Venture asserts that the discretionary clause demonstrates "the parties' mutual intent for [Freedom Circle Venture] to retain sole discretion on whether, and how, to terminate or modify the zoning restrictions on the property" and shows Intel "relinquished all power to affect the property's zoning and simply agreed to cooperate with [Freedom Circle Venture]'s plans for the property." However, as noted in our discussion *ante* (fn. 5), it is far from clear that the discretion specified in section 3.7 extends to zoning.

Moreover, this proposed interpretation fails to acknowledge that the implied covenant of good faith and fair dealing imposes a duty to exercise such discretionary power in good faith and by fair dealing. (*Carma Developers, Inc. v. Marathon Development California, Inc.*, *supra*, 2 Cal.4th 342, 372 (*Carma*).) As stated by the California Supreme Court in *Carma*, "In the case of a discretionary power, . . . the covenant requires the party holding

such power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively.' " (*Ibid*.)

Although Freedom Circle Venture cites *Carma* in support of its position, the decision is factually inapposite. There, the commercial lease at issue not only permitted the lessor to terminate the lease upon the lessee's notice of intent to sublet or assign, but also to pursue a new lease directly with the proposed transferee or another without sharing any profit with the lessee. (*Carma*, *supra*, 2 Cal.4th at p. 374.) In light of the lease terms, our high court concluded that the lessor's "termination of the lease in order to claim for itself appreciated rental value of the premises was expressly permitted by the lease and was clearly within the parties' reasonable expectations" (*id*. at p. 376) and rejected any breach of the implied covenant of good faith and fair dealing (*ibid*.).

By contrast, the parties' reasonable expectations centered on Freedom Circle Venture's intent to process the project approvals as set forth in the second amendment. Drawing guidance from *Carma*, while the covenant of good faith may not "be read to prohibit a party from doing that which is expressly permitted by an agreement" (*Carma*, *supra*, 2 Cal.4th at p. 374), neither does it permit a party to exercise discretionary power in a manner that undermines the expectations of the parties as contemplated at the time of formation (*id*. at p. 372).

Under our analysis of the contractual terms *ante* (pt. II.B.3.), even assuming the buyer's discretionary power in section 3.7 of the agreement extended to its pursuit of zoning approvals, that discretion must be construed together with the other agreement provisions, including the second

amendment's post-closing payment provisions. Read in context of the alleged circumstances of the agreement and second amendment (*Mountain Air*, *supra*, 3 Cal.5th at p. 752), Freedom Circle Venture's discretion to modify or terminate the existing restrictions therefore had to be exercised consistently with the expectation of the parties as contemplated when entering the agreement and second amendment. (*Carma*, *supra*, 2 Cal.4th at p. 372.)

We conclude, for purposes of review on demurrer, that Intel has adequately stated facts sufficient to support an alternative claim for breach of the implied covenant of good faith and fair dealing.

E. *Intentional Interference with Contractual Relations (Fourth Cause of Action)*

Intel's fourth cause of action against Greystar for intentional interference with contractual relations pairs with its claim for breach of the implied covenant of good faith and fair dealing. Intel pleaded intentional inference against Greystar in the alternative to its breach of contract claim.

The trial court sustained the demurrer as to the fourth cause of action after concluding that, because the contract between the parties did not require Freedom Circle Venture to pursue the mixed-use office and residential development, Greystar could not have caused a breach or disruption of the contractual relationship if it caused Freedom Circle Venture not to pursue the predefined "project approvals."

"[C]onsistent with its underlying policy of protecting the expectations of contracting parties against frustration by outsiders who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with contract does not lie against a party to the contract." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.) " 'The elements which a plaintiff must plead to state the

cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' " (*Quelimane, supra*, 19 Cal.4th at p. 55.)

Greystar's demurrer challenged the sufficiency of the intentional interference with contract claim on three grounds. Greystar reasserts only the second and third reasons in its respondent's brief on appeal.

Consistent with the trial court's conclusion in sustaining the demurrer to the fourth cause of action, Greystar argues it cannot be liable for intentional interference with contract because it did not interfere with any performance to which Intel was entitled. More specifically, Greystar asserts that because Freedom Circle Venture was under no contractual agreement to seek any particular approval for rezoning the property, Greystar could not have interfered with Intel's benefits under the agreement by causing Freedom Circle Venture not to seek the stated project approvals.

Our conclusion that Intel adequately pleaded breach of the implied covenant of good faith and fair dealing against Freedom Circle Venture leads us to reject this contention. The facts alleged in the complaint, taken as true in reviewing the demurrer order (*Yvanova, supra*, 62 Cal.4th at p. 924), plead that Greystar's actions induced Freedom Circle Venture to abandon the intended project approvals in such a way as to frustrate the expectations of the parties at the time of contracting and impede Intel's receipt of any potential benefit under the second amendment. This is sufficient to satisfactorily plead Greystar intentionally acted " 'to induce a . . . disruption

45

of the contractual relationship' " (*Quelimane*, *supra*, 19 Cal.4th at p. 55), as required to state a tortious interference claim.

Greystar also contends the complaint fails to state a cognizable claim because Intel has not alleged that Greystar used wrongful means to cause Freedom Circle Venture not to seek the defined project approvals. Intel counters that the "wrongful means" argument pertains to an affirmative defense of privilege, which falls on Greystar to assert and prove and does not affect the pleading standard applicable to Intel's claim on demurrer. We agree.

In support of its position, Greystar relies on case authority holding that "owners or officers of a business entity [may] be held liable for interfering with that entity's contracts, subject to the defense of certain privileges." (*Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344, 353; see *Collins v. Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 883.) The existence of the privilege is a fact specific issue that "depends on whether the defendant used improper means and acted to protect the best interests of his own company." (*Woods*, at p. 351, fn. 7.) Where a claim for contractual interference is asserted against the noncontracting owners, officers, or directors of the company subject to the contract, the noncontracting defendants may attempt to prove their conduct was privileged by showing "that they did not 'use improper means.' " (*Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 959.)

Under these circumstances, Greystar—not Intel—bears the burden to establish the defense of privilege. (See Evid. Code, § 500.) We conclude Intel need not have alleged facts that Greystar employed wrongful means, which comprises none of the elements required for intentional interference with contractual relations. (See *Quelimane*, *supra*, 19 Cal.4th at p. 55.) Intel has

therefore stated facts sufficient to plead a cause of action against Greystar for intentional interference with contractual relations.

### F. Declaratory Relief (Third Cause of Action)

The trial court sustained Freedom Circle Venture's demurrer as to the third cause of action for declaratory relief based on its determination that the complaint failed to state a claim for breach of contract or breach of the implied covenant of good faith and fair dealing. Intel does not challenge that ruling on appeal. Freedom Circle Venture and Greystar separately assert that Intel has abandoned or waived its claim for declaratory relief by failing to raise the issue in its appellate briefing. (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["Issues not raised in an appellant's brief are deemed waived or abandoned."].)

As our Supreme Court has explained, " ' "waiver" means the intentional relinquishment or abandonment of a known right.' " (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475.) By contrast, " 'forfeiture results from the failure to invoke a right . . .; the two are not the same.' " (*Id.* at p. 476.) Here, Intel has failed to invoke its right to challenge the trial court's ruling on the declaratory relief cause of action or otherwise raise the issue on appeal to preserve it for consideration on remand. Nevertheless, we decline to deem forfeited the viability of the third cause of action.

Our determination that, considering the agreement, amendments, and well pleaded factual allegations of the complaint, the second amendment "is 'reasonably susceptible' to the meaning ascribed to it in the complaint" (*Klein*, *supra*, 202 Cal.App.4th at p. 1384), requires the trial court to overrule the demurrer on the central issue in this case as to the alleged breach of contract. In the third cause of action, Intel has alleged a present and actual controversy between Intel and Freedom Circle Venture with respect to

47

Freedom Circle Venture's obligation to pay Intel the post-closing payment under the second amendment. As these allegations are wholly derivative of Intel's breach of contract cause of action, which we have deemed cognizable, we shall direct the trial court to overrule the demurrer as to Intel's claim for declaratory relief.

## III. DISPOSITION

The judgment as to Freedom Circle Venture, LLC is reversed. The trial court is directed to vacate the order sustaining the demurrer as to Freedom Circle Venture, LLC and to enter a new order overruling the demurrer as to the first, second, and third causes of action.

The judgment as to GS Freedom Circle Holdings, LLC, Greystar Investment Group, LLC, and Greystar Real Estate Partners, LLC is reversed. The trial court is directed to vacate the order sustaining the demurrer as to GS Freedom Circle Holdings, LLC, Greystar Investment Group, LLC, and Greystar Real Estate Partners, LLC and to enter a new order overruling the demurrer as to the first, second, and fourth causes of action.

Appellant is entitled to recover its reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____

                                                    Danner, J.

WE CONCUR:


_____

Greenwood, P. J.


_____

Bromberg, J.


**H053201**
*Intel Corporation v. Freedom Circle Venture, LLC, et al.*